**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CV-23-01581-PHX-SHD |
| Plaintiff, | **ORDER** |
| v. | |
| Sabir Qasim, | |
| Defendant. | |

Pending before the Court are dueling motions for summary judgment filed by Plaintiff the United States (the "Government") and Defendant Sabir Qasim. (Docs. 40, 44.) The parties largely agree on the material facts of this case, which highlight both the value of United States citizenship and the desperate measures some parents are willing to take so their children may enjoy the safety, freedom, and prosperity that the United States offers. The parties differ, however, as to whether these facts render Qasim's citizenship revocable. Because the facts and applicable law require revocation, the Government's motion is **granted** and Qasim's motion is **denied**.

## I.     FACTUAL BACKGROUND

The following facts are derived from the parties' statements of facts and evidence submitted with their motions for summary judgment.

### A.     Qasim's Immigration to the United States and Naturalization

Qasim was born in Afghanistan but, when he was "around eight or nine" years old, he and his family left Afghanistan and moved to Pakistan. (Doc. 43-1 at 8; Doc. 43 at 1.)

When Qasim and his family first moved to Pakistan, he lived with his mother, Zubaida; his father, Qasim; his brothers, Zahir and Nasir; and his sister, Sabrina. (Doc. 43-1 at 9; Doc. 43 at 1; *see also* Doc. 41 at 2.)

Qasim and his family had a longstanding relationship with Latifa Mehmoodi, from around when Qasim was five or six years old. (Doc. 43-1 at 13–14, 18.) Mehmoodi is related to Qasim through Mehmoodi's uncle, who is also Qasim's grandfather. (Doc. 41-2 at 6; *see also* Doc. 41 at 2; Doc. 43 at 2.) Around when Qasim was thirteen or fourteen years old, he and some of his family members began to live with Mehmoodi. (Doc. 43-1 at 13–15, 18.) Qasim testified that, upon Mehmoodi's request, his parents transferred guardianship over himself and Nasir to Mehmoodi, so that Qasim and his brother could "have a better life." (*Id.* at 17, 20.) Mehmoodi testified that Zubaida requested Mehmoodi take Qasim to "have a better life and education," and Qasim's briefing asserts Zubaida requested a "kafala" arrangement. (Doc. 41-2 at 7; Doc. 43 at 4.) Qasim testified that "kafala,"[1] is a cultural arrangement in which parents give their child to a third person, and the child treats this person as his or her parent. (Doc. 43-1 at 17; Doc. 41-2 at 18 ("It's kafalat. That means their responsibility."); *id.* at 20.) Qasim and Nasir testified in their depositions that their mother executed a document, but Mehmoodi testified in her deposition this did not happen, and the parties state in their summary judgment briefing that the kafala arrangement was verbal. (*Compare* Doc. 43-1 at 17, 150, *and id.* at 181 (interrogatory responses), *with* Doc. 41-2 at 8, *with* Doc. 41 at 2, *and with* Doc. 43 at 2, 5.)

In or around 2001, when Qasim was sixteen years old, Mehmoodi began the process to be classified as a refugee with the United States and be resettled. (*See* Doc. 41-4; Doc. 43-1 at 19–20; Doc. 41 at 3.) In the application process and relevant interviews, Mehmoodi stated Qasim and Nasir were her biological children and that Qasim's father was her husband. (Doc. 41-2 at 7, 9–10; Doc. 41-4 at 3; Doc. 43 at 2.)[2] Instead of listing where

---

[1] Mehmoodi testified that this was called "kafalat." (Doc. 41-2 at 18.) The Court uses "kafala" for simplicity, as it is what the parties used in their briefing.

[2] Mehmoodi previously told federal agents that Qasim and Nasir "did most of the

1    Qasim and Nasir were actually born, Mehmoodi stated that Qasim and Nasir were born
2    where she was born.  (Doc. 41-4 at 3; Doc. 43-1 at 8, 25.)  In a refugee registration form
3    completed by Qasim or on his behalf,[3] Qasim was listed as the "son of" Mehmoodi.  (Doc.
4    41-5 at 20; *see also id.* at 22; Doc. 41 at 3.)  The document purports to contain Qasim's
5    signature swearing that the contents of the form are true.  (Doc. 41-5 at 21.)  Qasim's
6    registration was approved.  (*Id.*; Doc. 41 at 4.)

7        Mehmoodi testified that, once Mehmoodi, Qasim, and Nasir came to the United
8    States in November 2002, (Doc. 42-1 at 14; Doc. 43-1 at 22; Doc. 41 at 4), she intended to
9    stay in Kansas while Qasim's family took him and Nasir to Arizona so they could enroll in
10   school.  (Doc. 41-2 at 11.)  However, Mehmoodi ultimately moved to Arizona with Qasim
11   and Nasir because she "felt . . . responsible for them."  (*Id.*)  In Arizona, Qasim and Nasir
12   lived with Mehmoodi, and Mehmoodi prepared food for them, washed their clothes, and
13   cleaned.  (*Id.* at 24, 26.)  Nasir testified that Mehmoodi required Qasim and him to refer to
14   her as "Mom" and scolded Nasir when he "slipped" because they could "get in trouble."
15   (Doc. 43-1 at 167.)  Qasim lived with Mehmoodi until he married Maliha Ghani in 2004.
16   (Doc. 41-2 at 12; Doc. 41-5 at 8.)

17       On January 14, 2004, Qasim completed a Form I-485, which is an Application to
18   Register Permanent Residence or Adjust Status.  (Doc. 41-5 at 16–19; Doc. 41 at 4.)  In
19   the application, Mehmoodi was listed as Qasim's mother.  (Doc. 41-5 at 17; Doc. 41 at 4–
20   5.)  Nasir testified that Qasim may have told a Catholic Social Services case worker who
21   assisted with their Form I-485 that Mehmoodi was not their real mother, and the case
22   worker "brushed it off."  (Doc. 43-1 at 167.)  Qasim also answered "no" to the question of
23   whether he had, "by fraud or willful misrepresentation of a material fact, ever sought to
24   procure, or procured, a visa, other documentation, entry into the U.S., or any other
25   talking and translation, and they were the primary persons telling officials they were
26   [Mehmoodi's] sons."  (Doc. 41-8 at 6.)  However, Mehmoodi also clarified in her
     deposition that she filled out all the refugee paperwork.  (Doc. 41-2 at 21.)

27   [3]    Qasim testified that he could not "recall signing this" document and that it was not
28   his handwriting in the form.  (Doc. 43-1 at 19.)  He also testified that he did not recall
     signing a document containing biographical information and that he did not sign his name
     as it was in the form.  (*Id.* at 21–22.)

immigration benefit." (Doc. 41-5 at 18.)  Qasim signed the Form I-485 under penalty of perjury.  (*Id.* at 19; Doc. 41 at 5.)  Qasim's application was approved.  (Doc. 41-5 at 16; Doc. 41 at 5.)

On March 7, 2009, Qasim completed a Form N-400, which is an Application for Naturalization.  (Doc. 41-5 at 5–15; Doc. 41 at 5.)  The Form N-400 contained a series of questions, including whether Qasim ever "committed a crime or offense for which [he was] **not** arrested," "given false or misleading information to any U.S. Government official while applying for any immigration benefit," or "lied to any U.S. Government official to gain entry or admission into the United States."  (Doc. 41-5 at 12; Doc. 41 at 5–6.)  Qasim answered "No" to these questions under penalty of perjury.  (Doc. 41-5 at 12, 14; Doc. 41 at 5–6.)  At an interview with immigration officials, Qasim answered under oath that he had not committed a crime or offense for which he had not been arrested and again signed to affirm his answers were true under oath.  (Doc. 41-7 at 4; Doc. 41 at 6–7.)

Qasim's application was approved "[b]ased on the information available to" immigration officials, "including [Qasim's] representations in his Form N-400 and the statements he made during [the] interview."  (Doc. 41-5 at 5; Doc. 41-7 at 4; Doc. 41 at 7.)  The immigration official who interviewed Qasim and approved his application stated he would not have approved Qasim's naturalization application that day had he known Qasim was not Mehmoodi's child, as had been represented in Qasim's application for refugee status.  (Doc. 41-7 at 5.)  Rather, the official would have, "at minimum, conducted further inquiry into [Qasim's] eligibility to naturalize."  (*Id.*)

On November 9, 2009, Qasim completed a Form N-445, which is a Notice of Naturalization Oath Ceremony.  (Doc. 41-5 at 3.)  The Form N-445 contained a series of questions, including whether Qasim "knowingly committed any crime or offense, for which [he had] not been arrested" or gave "false testimony to obtain immigration benefits." (*Id.* at 4.)  Qasim answered "No" to both questions and certified his answers were "true and correct as of the date of [his] naturalization oath ceremony."  (*Id.*)  On November 13, 2009, Qasim became a naturalized citizen.  (*Id.* at 2; Doc. 41 at 7.)

**B.      Investigation into False Statements**

In 2013, Mehmoodi found a "card on [her] front door" requesting that she return a phone call to answer questions about Qasim.  (Doc. 41-2 at 12.)  Mehmoodi informed Ghani of this, who told Mehmoodi to give Ghani the phone number "because that could be [Qasim's] boss," and Ghani would talk to him herself.  (*Id.*)  Mehmoodi then received another call and learned that she would need to be questioned by the Federal Bureau of Investigation ("FBI").  (*Id.*)

On March 26, 2013, the FBI interviewed Mehmoodi.  (Doc. 41-8 at 3; Doc. 41 at 7.)  During this interview, Mehmoodi admitted that Qasim and Nasir were not her children as "claimed on her U.S. Immigration application," and Qasim's father was her cousin and not her husband.  (Doc. 41-8 at 3; Doc. 41 at 7.)  She claimed "that while she was living in Pakistan she didn't speak any other languages, besides Dari so during the refugee process [Qasim and his brother] did most of the talking and translation, and they were the primary persons telling officials they were [her] sons."  (Doc. 41-8 at 6.)  Mehmoodi also stated she had not been in contact with Qasim for approximately five to seven years, and that Qasim "started to distance" himself from her around the time he applied for legal permanent residence.  (*Id.* at 4–5; *see also* Doc. 41-2 at 13, 15.)

At another FBI interview on May 8, 2013, Mehmoodi stated that she met with Qasim and Ghani about her previous FBI interview.  (Doc. 41-8 at 7.)  During this meeting, Qasim "instructed [Mehmoodi] to continue to say she [was Qasim's and Nasir's] mother."  (*Id.*)  Ghani, too, "chimed in during the conversation and told [Mehmoodi] to continue to lie regarding [Qasim] and not to let the [Government] pressure her into cooperating."  (*Id.*)

In or around May 22, 2013, Mehmoodi wore a wire during a meeting with Qasim and Ghani, allowing the FBI to obtain a transcript of the meeting.  (*Id.* at 25; Doc. 41-2 at 16; Doc. 43-1 at 121–22; Doc. 41 at 7.)  Qasim stated in this conversation that it was "not a lie" that Mehmoodi was his mother.  (Doc. 41-8 at 41.)  When questioned by Nasir about what he should say to government officials, Qasim stated that if Nasir said Mehmoodi was "not [his] mother, *then you are done*," and "everything is over."  (*Id.* at 49.)  The

government would "question [why Nasir] lied in the first place to get in [the United States]." (*Id.*)  Qasim then joked about Nasir's proposed solution to say Mehmoodi was their "adopted mother," and Ghani said that Qasim should "never in [his] life say such a thing" because the Government "might suddenly say that [they] are illegal." (*Id.* at 51.  *But see* Doc. 43-1 at 147 (Nasir denying that it "was [his] idea to tell [immigration officials] . . . that [he and Qasim were] adopted by [Mehmoodi]".)  Qasim then told Mehmoodi that, instead, he instructed Nasir to tell "his friends" and contacts that "they kn[ew] Nasir and that [Mehmoodi] is his mother, [but] they don't know what her name is and where she lives." (Doc. 41-8 at 51.)  According to Mehmoodi, this occasion was the first time she heard about "the idea of saying that [she was Qasim's] adopted mother." (Doc. 41-2 at 15–16.  *But see* Doc. 43-1 at 109, 114–15, 119 (Ghani's testimony indicating Mehmoodi presented Qasim and Nasir as her adopted sons previously).)[4]

On May 31, 2013, the FBI interviewed Qasim with Ghani present. (Doc. 41-8 at 8; Doc. 41 at 7.)  During the interview, Qasim told FBI agents that Zubaida was his aunt, his father died, and Mehmoodi was his mother but "they [were] not close." (Doc. 41-8 at 8, 10; Doc. 41 at 7.)

On June 3, 2013, the FBI interviewed Mehmoodi again. (Doc. 41-8 at 17.) Mehmoodi told FBI agents that Zubaida "asked [her] if she would immigrate . . . to the U.S. and claim Zubaida's children, [Nasir and Qasim], as her own." (*Id.*)  According to Mehmoodi, it was Zubaida's idea for Mehmoodi to "claim[] to be widowed [to] improve Mehmoodi's chances of acceptance into the U.S." (*Id.*)  She also stated that, once she and Qasim were in the United States, she told a Catholic Social Services case worker— although not the case worker assigned to Qasim in obtaining his lawful permanent resident status—that Qasim and Nasir were not her children. (*Id.* at 18; *see also* Doc. 43-1 at 146.)

On November 12, 2013, Qasim was indicted for false procurement of naturalization and for obtaining a passport by a false statement. (Doc. 41-9; Doc. 41 at 8.)

---

[4]    In his deposition, Nasir testified that he did not mean to say Mehmoodi adopted him in the American sense in which "you have to change your last name, your full name, your this and that." (Doc. 43-1 at 148.)

1    In March 2014, the FBI interviewed Nasir and recorded it.  (Doc. 41-8 at 60.)

2  During the interview, Nasir admitted Zubaida was his "real mom."  (*Id.* at 62; Doc. 41 at

3  8; Doc. 43 at 3.)  Nasir stated that Qasim was the one interviewed during the initial refugee

4  application process.  (Doc. 41-8 at 65.)  Nasir also stated that although Mehmoodi was not

5  his biological mother, she was "like [his] mom" and their "relationship [was] very close."

6  (*Id.* at 75.)   But he agreed that Mehmoodi was called his mother to protect him and

7  Mehmoodi.  (*Id.* at 77.)

8    Also in March 2014, the FBI interviewed Ghani.  (Doc. 41-10 at 3; Doc. 41 at 8.)

9  Ghani told the government officials that Qasim's mother was Mehmoodi and Mehmoodi

10  was "crazy."  (Doc. 41-10 at 3–4; Doc. 41 at 8.)  She stated Mehmoodi "makes up stories

11  about other people in the community, but the people don't believe her stories," and that

12  Mehmoodi "takes medication."  (Doc. 41-10 at 4.)  When questioned about an answer

13  Ghani gave, however, Ghani admitted Qasim's true parents lived in Pakistan and Qasim's

14  mother was Zubaida.  (*Id.* at 5; Doc. 41 at 8.)  But she stated it was Mehmoodi's "idea to

15  pose as [Qasim's and Nasir's] mother and come to the U.S."  (Doc. 41-10 at 7.)

16    Mehmoodi told FBI agents that, on March 8, 2014, Ghani came to Mehmoodi's

17  house and "told Mehmoodi that she wanted Mehmoodi to sign a document which said

18  Mehmoodi was the adopted mother of [Qasim] and Nasir."  (Doc. 41-2 at 17; Doc. 41 at 8.

19  *But see* Doc. 43-1 at 118.)  Ghani told Mehmoodi that she was "not telling [her] to say [she

20  was] not [Qasim and Nasir's] mother, but [to] tell [government officials Mehmoodi is] their

21  adopted mother" and that Mehmoodi adopted Qasim and Nasir "when they were young

22  from a poor family."  (Doc. 41-2 at 17.)  This occasion and the recorded conversation

23  between Mehmoodi, Qasim, and Ghani were, according to Mehmoodi, the "only two times

24  that [Mehmoodi] had ever heard the idea of adoption come up."  (*Id.* at 18.)

25    On April 21, 2014, the FBI interviewed Qasim again with his lawyer and an

26  Assistant U.S. Attorney present.  (Doc. 41-8 at 11; Doc. 41 at 8.)  In this interview, Qasim

27  admitted Zubaida was his "true mother" and that he "lied to U.S. immigration authorities

28  prior to immigrating to the U.S. [in] claiming that [Mehmoodi] was his mother when she

1    was in fact not his mother."  (Doc. 41-8 at 11–12; Doc. 41 at 8; Doc. 43 at 3.)  Qasim also
2    "admitted that he continued to lie to immigration authorities and on immigration
3    paperwork, as well as to other U.S. government entities, after he had arrived in the U.S."
4    (Doc. 41-8 at 12; Doc. 41 at 8.)

5         On August 14, 2014, FBI agents again interviewed Qasim.  (Doc. 41-8 at 20.)
6    Qasim admitted that he previously disguised his relationship with his cousins to "avoid
7    detection of the false information he provided to the U.S. government claiming that
8    [Mehmoodi] was his mother," so he "listed [cousins] as friends on his U.S. immigration
9    paperwork . . . , rather than as his cousins and/or family."  (*Id.* at 24.)

10        **C.     Qasim's Guilty Plea**

11        On January 30, 2015, the Government and Qasim lodged a plea agreement in which
12   Qasim pled guilty to one count of Accessory After the Fact for Nasir's false statements to
13   immigration officials.  (Doc. 42-1 at 1, 8 (signature); Doc. 41 at 9; Doc. 43 at 3.)  By
14   entering into the plea agreement, Qasim agreed to waive any right to appeal or to collateral
15   attack of his conviction, except for a claim for ineffective assistance of counsel.  (Doc. 42-
16   1 at 4–5.)  Qasim also agreed to admit the following facts: (1) that he met with Mehmoodi
17   in May 2013 to "convince her to continue telling U.S. authorities that Nasir . . . was her
18   true son"; (2) at this time, Qasim knew that when Nasir "applied to adjust his immigration
19   status in January 14, 2004, from Refugee to Legal Permanent Resident, he represented that
20   [Mehmoodi] was his true mother"; (3) that he was aware Mehmoodi was not Nasir's
21   biological mother; and (4) that his "purpose in speaking with [Mehmoodi] on May 7, 2013,
22   was to keep [Nasir's] immigration status from being questioned by the United States
23   government and to prevent his apprehension, trial or punishment."  (*Id.* at 6; Doc. 41 at 9.)

24        On March 30, 2015, the Government and Nasir lodged a similar plea agreement, in
25   which Nasir pled guilty to one count of Accessory After the Fact for knowing that Qasim
26   "had committed the crime of Naturalization Fraud" and assisting Qasim in preventing
27   Qasim's "apprehension, trial or punishment."  (Doc. 42-2 at 1, 6, 8; Doc. 41 at 9.)

28        On April 13, 2015, this Court accepted Qasim's plea agreement and sentenced him

to three years of probation and 100 hours of community service.  (Doc. 42-3; Doc. 41 at 9.)  At Qasim's sentencing hearing, Qasim stated that he "made a mistake of judgment at an age when [he] should have known that to continue with a lie [he knew] about was wrong."  (Doc. 42-4 at 8–9; Doc. 41 at 9.)  He also stated that he and Nasir "came to the United State[s] with the backdrop of that lie enabling [them] to come here, and [he chose] to continue with that lie for many motivation[s], but [he] had the choice to proceed without that lie being corrected as time had marched on."  (Doc. 42-4 at 9; Doc. 41 at 9.)

## II.    PROCEDURAL HISTORY

On August 7, 2023, the Government filed the Complaint to revoke Qasim's naturalization under 8 U.S.C. § 1451(a) based on grounds that Qasim (1) was not a child of a refugee, (2) willfully misrepresented his relationship with Mehmoodi in his immigration applications, (3) gave false testimony during his naturalization interview that he had not committed a crime or offense for which he was not arrested, (4) made several false statements that deprived him of the "good moral character" necessary to qualify for naturalization, and (5) misrepresented or concealed on his Form N-400 and in his naturalization interview that he had perjured himself.  (Doc. 1.)

On July 18, 2024, the Government filed its motion for summary judgment, (Doc. 40), along with a separate statement of facts and exhibits, (Docs. 41, 42).  The motion was fully briefed thereafter.  (Docs. 45, 50.)

On July 31, 2024, Qasim filed his motion for summary judgment, also with a separate statement of facts and exhibits.  (Docs. 43, 44.)  That motion has also since become fully briefed.  (Docs. 48, 49, 54.)

On September 25, 2025, the Court held oral argument.

## III.    SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Not all factual disputes are material or genuine, however: a "fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine'

1    only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno*

2    *Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014).  The court

3    "must view the evidence in the light most favorable to the nonmoving party and draw all

4    reasonable inference[s] in the nonmoving party's favor." *Rookaird v. BNSF Ry. Co.*, 908

5    F.3d 451, 459 (9th Cir. 2018).  "Summary judgment is improper where divergent ultimate

6    inferences may reasonably be drawn from the undisputed facts." *Fresno Motors*, 771 F.3d

7    at 1125 (internal quotation marks omitted).  Where, as here, "parties submit cross-motions

8    for summary judgment, [e]ach motion must be considered on its own merits," but the Court

9    must consider all evidence submitted in support of both cross-motions when separately

10   reviewing the merits of each motion.  *Fair Hous. Council of Riverside Cnty., Inc. v.*

11   *Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (quotation marks omitted).

12       At summary judgment, there are shifting burdens of production.  A party moving

13   for summary judgment "bears the initial responsibility of informing the district court of the

14   basis for its motion, and identifying those portions of the pleadings, depositions, answers

15   to interrogatories, and admissions on file, together with the affidavits, if any, which it

16   believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v.*

17   *Catrett*, 477 U.S. 317, 323 (1986) (quotation marks omitted).  "In order to carry its burden

18   of production, the moving party must either produce evidence negating an essential element

19   of the nonmoving party's claim or defense or show that the nonmoving party does not have

20   enough evidence of an essential element to carry its ultimate burden of persuasion at trial."

21   *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

22       If the "moving party carries its burden of production, the nonmoving party must

23   produce evidence to support its claim or defense." *Id.* at 1103.  "If the nonmoving party

24   fails to produce enough evidence to create a genuine issue of material fact, the moving

25   party wins the motion for summary judgment." *Id.*  There is no issue for trial unless enough

26   evidence favors the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249

27   (1986).  "If the evidence is merely colorable or is not significantly probative, summary

28   judgment may be granted." *Id.* at 249–50 (citations omitted).  At bottom, the Court's

- 10 -

1   "inquiry as to whether a genuine issue exists will be whether the evidence presented is such
2   that a jury applying that evidentiary standard could reasonably find for either the plaintiff
3   or the defendant."  *Id.* at 255.

4   **IV.    DISCUSSION**

5         **A.    The Parties' Cross-Motions on Count One**

6         The parties both move for summary judgment on Count One of the Government's
7   Complaint, which alleged that Qasim was not eligible for refugee status because he was
8   not a child of a refugee and, consequently, was not lawfully admitted for permanent
9   residence or for later naturalization.  (Doc. 1 at 12–14; Doc. 40 at 2; Doc. 44 at 9–12.)
10  Whether Qasim was lawfully admitted for permanent residence turns on the nature of the
11  kafala arrangement between Qasim and Mehmoodi, and whether that specific kafala
12  arrangement constitutes an "adoption" under 8 U.S.C. § 1101(b)(1)(E) of the Immigration
13  and Nationality Act ("INA").[5]  For the following reasons, the kafala arrangement at issue
14  in this case does not qualify as an adoption and the Government is entitled to summary
15  judgment on this case-dispositive issue.

16        **1.    Legal Standard for Revocation**

17        The Supreme Court has "recognized that there must be strict compliance with all
18  the congressionally imposed prerequisites to the acquisition of citizenship," and the failure
19  to "comply with any of these conditions renders the certificate of citizenship 'illegally
20  procured,' and naturalization that is unlawfully procured can be set aside."  *Fedorenko v.*
21  *United States*, 449 U.S. 490, 506 (1981).  The "judicial insistence on strict compliance with
22  the statutory conditions precedent to naturalization is simply an acknowledgment of the
23  fact that Congress alone has the constitutional authority to prescribe rules for
24  naturalization."  *Id.*; *see also United States v. Ginsberg*, 243 U.S. 472, 475 (1917) ("No
25  alien has the slightest right to naturalization unless all statutory requirements are complied

---

26  [5]      In its briefing and at oral argument, the Government argued that Qasim was
27  admitted as Mehmoodi's purported biological child and the "'adoption' claim is a recent
    invention to avoid the negative consequences of . . . immigration fraud."  (*See* Doc. 40 at
28  12.)   The Court does not address these arguments because, even accepting Qasim's
    statements that his parents entered into a kafala arrangement with Mehmoodi, the
    Government still prevails on Count One.

1    with . . . .").  "[T]he wrong sought to be redressed by § 1451(a) is a wrong to the public,

2    [and] revocation of citizenship is not sought for the purpose of punishment or to deter future

3    violations," but instead, "to remedy a past fraud by taking back a benefit to which the alien

4    is not entitled and thus restoring the status quo ante."  *United States v. Phattey*, 943 F.3d

5    1277, 1282–83 (9th Cir. 2019).

6         Accordingly, the Government may bring suit to revoke a naturalized citizen's

7    citizenship if it was "illegally procured or . . . procured by concealment of a material fact

8    or by willful misrepresentation."  8 U.S.C. § 1451(a).  Under the first basis for revocation

9    set forth in the statute, if a petitioner was "as a matter of law[] ineligible for a visa," the

10   "failure to comply with the statutory prerequisites for naturalization renders [a] certificate

11   of citizenship revocable as 'illegally procured.'"  *Fedorenko*, 449 U.S. at 514; *see also*

12   *United States v. Teng Jiao Zhou*, 815 F.3d 639, 643 (9th Cir. 2016) ("Naturalization was

13   illegally procured if the individual did not meet the statutory requirements for citizenship."

14   (quotation marks omitted)).  As for the second independent basis for revocation in the

15   statute, the misrepresentation or concealment must "be willful" and "must also relate to a

16   material fact."  *Fedorenko*, 449 U.S. at 507 n.28.  A fact is material if "disclosure of the

17   true facts would have made the applicant ineligible for a visa."  *Id.* at 509.

18        If either of these statutory bases are met, "district courts lack equitable discretion to

19   refrain from entering a judgment of denaturalization."  *Id.* at 517.  In other words, "once a

20   district court determines that the Government has met its burden of proving that a

21   naturalized citizen obtained his citizenship illegally or by willful misrepresentation, it has

22   no discretion to excuse the conduct."  *Id.*

23        Nevertheless, "the right to acquire American citizenship is a precious one

24   and . . . once citizenship has been acquired, its loss can have severe and unsettling

25   consequences."  *Id.* at 505.  Accordingly, the Government "carries a heavy burden of proof

26   in a proceeding to divest a naturalized citizen of his citizenship," and the "evidence

27   justifying revocation of citizenship must be clear, unequivocal, and convincing and not

28   leave the issue in doubt."  *Id.* (quotation marks omitted).

1

### 2.      Pertinent Immigration Law

2       The Government moves for summary judgment under the first basis of removal in

3  § 1451(a), claiming that Qasim illegally procured citizenship because he was ineligible for

4  lawful permanent resident status as a matter of law.  This is because "[o]ne requirement for

5  citizenship is that an applicant must first have been lawfully admitted to the United States

6  as an LPR [Lawful Permanent Resident]."  *United States v. Brown*, 2019 WL 5549174, at

7  *2 (D. Ariz. 2019); *see also* 8 U.S.C. § 1429 ("[N]o person shall be naturalized unless he

8  has been lawfully admitted to the United States for permanent residence in accordance with

9  all applicable provisions . . . .").

10      The term "lawfully" in "lawfully admitted" "denotes compliance with substantive

11  legal requirements, not mere procedural regularity."  *Kyong Ho Shin v. Holder*, 607 F.3d

12  1213, 1217 (9th Cir. 2010) (citation omitted).  Put another way, a person may have illegally

13  procured citizenship even absent "acts of personal fraud or misrepresentation."  *See id.*; *see*

14  *also Teng Jiao Zhou*, 815 F.3d at 645 ("While the individual's scienter with respect to any

15  misrepresentation is relevant to the [second prong under § 1451(a)], there is no authority

16  in the statute or case law to require the government to prove that [a defendant] knew his

17  conduct was illegal at the time he naturalized under the [first prong].")  Accordingly, if the

18  undisputed facts show that Qasim was not lawfully admitted as a permanent resident, his

19  naturalization must be revoked.  *Fedorenko*, 449 U.S. at 517; *Brown*, 2019 WL 5549174,

20  at *1, 3 (granting judgment in government's favor where defendant was inadmissible for

21  permanent residence, so her permanent residence initially granted was "void ab initio" and

22  naturalization was illegally procured as a result).

23      For a person to qualify for an adjustment to lawful permanent residency based on

24  refugee status, one requirement is that the person must be a "refugee . . . or a spouse or

25  child of such a refugee."  8 U.S.C. § 1159(b)(4); *see also id.* § 1157.  The term "child" is

26  statutorily defined, and as relevant here, includes a "child adopted while under the age of

27  sixteen years if the child has been in the legal custody of, and has resided with, the adopting

28

1    parent or parents for at least two years." *Id.* § 1101(b)(1)(E)(i).[6]

2        "For an adoption to be valid under section 1101(b)(1)(E), an adoption need not

3    conform to the [Board of Immigration Appeal's] or Anglo-American notions of adoption,"

4    but instead "need only be recognized under the law of the country where the adoption

5    occurred." *Kaho v. Ilchert*, 765 F.2d 877, 885 (9th Cir. 1985). Even so, the foreign

6    relationship between the adult and child must still be the functional equivalent of adoption

7    as Congress used that term in § 1101(b)(1)(E).

8        "[U]nder [§ 1101's] definitions of 'parent' and 'child,' adoption terminates the legal

9    relationship between a natural parent and an adopted child," such that an "adopted child's

10    only 'parents' under the statute are her adoptive parents." *Young v. Reno*, 114 F.3d 879,

11    885 (9th Cir. 1997) (reasoning that § 1101 did not expressly consider a biological brother

12    or sister of an individual who has been adopted as a brother or sister under the statute

13    because the adoption terminated "the legal relationship between [the] natural parent and

14    [the] adopted child" and therefore the "natural sibling . . . does not share the same legal

15    parents"). In this statute, "Congress . . . contemplate[d] the effect of adoption on the

16    natural-parent/adopted-child relationship, specifically providing that adoption severs that

17    relationship." *Id.* at 886; *see also Adoption*, Black's Law Dictionary (12th ed. 2024)

18    (defining "adoption" as the "creation by judicial order of a parent-child relationship

19    between two parties" and distinguishing adoption from "legitimation and from fosterage"

20    because "[a]doption is permanent" and "fosterage is a temporary arrangement for a child's

21    care").

22        The central issue is thus whether the kafala arrangement Qasim's biological parents

23    entered into with Mehmoodi qualified Qasim as Mehmoodi's child within the scope of 8

24    U.S.C. §§ 1101 and 1159, because if Qasim was not a child of a refugee (Mehmoodi), he

25    was not lawfully admitted as a permanent resident and consequently did not meet the

---

26    [6]    This is the sole provision under which Qasim argues he qualifies as Mehmoodi's
27    child. (Doc. 45 at 11–12.) Furthermore, based on the undisputed facts that Mehmoodi is
not Qasim's biological parent nor married to either of Qasim's biological parents, Qasim
28    does not qualify under any other provision. *See* 8 U.S.C. § 1101(b)(1)(A) ("child born in
wedlock"), (B) ("stepchild"), (C) ("child legitimated"), (D) ("child born out of wedlock"),
(F)–(G) (adoption by United States citizen(s)).

1  requirements for naturalization.  8 U.S.C. § 1429.  Qasim has not argued that he would

2  otherwise qualify for naturalization, as he conceded at oral argument.  *Cf. Maslenjak v.*

3  *United States*, 582 U.S. 335, 351 (2017) (indicating that courts should give the "defendant

4  a chance to establish that she was qualified for citizenship . . . even though she concealed

5  or misrepresented facts that suggested the opposite" because courts "have never read a

6  statute to strip citizenship from someone who met the legal criteria for acquiring it").

### 3.    Overview of Kafala

8      It is necessary to examine the term "kafala" generally before delving into the

9  specific kafala arrangement at issue in this case because the parties frame the issue here as

10  whether kafala—in general—equates to adoption under 8 U.S.C. § 1101(b)(1)(E).  Indeed,

11  the parties' briefing appears to dispute at length whether *any* kafala arrangement could

12  qualify someone as an adopted child under that statute.  (*See* Doc. 40 at 19–21; Doc. 44 at

13  11–13; Doc. 45 at 5, 10–12; Doc. 48 at 4–8.)  At oral argument, the parties denied that they

14  seek a ruling on whether kafala generally would qualify as an adoption, and it would be

15  inappropriate to address this question for an additional reason: because kafala means

16  different things in different countries, regions, and contexts, there is no one-size-fits-all

17  answer to the question.

18      A report on adoption law in Afghanistan and Pakistan submitted by the Government

19  (the "Report"), states that the "legal creation of a parent-child relationship through adoption

20  is not recognised in Islamic law."  (Doc. 40-2 at 9–10 (quoting Kabeh Rastin-Tehrani &

21  Nadjma Yassari, *Max Planck Manual on Family Law in Afghanistan* 117 (amended 2d ed.

22  July 2012), [https://perma.cc/YVD3-4E9G]).)  The Report, however, describes kafala as a

23  system that "permits a care arrangement [where the] foster parent protects, feeds, clothes,

24  teaches and loves [the child] as her own."  (*Id.* at 10 (first alteration in original) (quoting

25  Nadirsyah Hosen, Research Handbook on Islamic Law and Society 58 (2018)); *see also id.*

26  ("Under Islamic law, the relationship with adopting parents is seen as a guardianship rather

27  than parenthood.  This is based on the belief that a child's lineage and heritage cannot be

28  erased or replaced with adoption." (quoting Kulsoom K. Ijaz, *Shifting Paradigms:*

*Promoting an American Adoption Campaign for Afghan Children*, 42 Syracuse J. Int'l L. & Com. 234, 243 (2014)).)

According to the Report, a kafala arrangement is similar to foster-parenting in the United States in that it is "regulated by the state," but it "serves as a permanent arrangement for the minor." (*Id.* at 11 (citation omitted).) But the Report notes that Pakistani individuals "often opt for informal adoptions according to their faith," even though these arrangements "do not establish a full legal parent-child relationship akin to western forms of legal adoption." (*Id.* at 12 (quotation marks omitted).) Moreover, the Report notes that "whether adoption is recognized is dependent on the personal laws of the community in question" and "[w]hether or not Pakistani law recognizes 'adoption' depends on how the term is defined." (*Id.* at 4.) At best, the Report thus establishes that kafala arrangements may or may not meet the requirements of Western adoption, but that the answer depends on the community and cultural practices in which the arrangement is made.

The Court's independent research confirms that kafala arrangements may have different characteristics depending on the relevant terms of the parties' agreement, and may mean different things depending on the country, region, and context. One author states that kafala is "used to refer to legal contexts of guardianship, adoption, and guaranteeing contracts." Bina Fernandez, *Traffickers, Brokers, Employment Agents, and Social Networks: The Regulation of Intermediaries in the Migration of Ethiopian Domestic Workers to the Middle East*, 47 Int'l Migration Rev. 814, 829 (2013); *see also* Joelle Long, *The Impact of the UNCRC on the Italian Legal System*, 17 Int'l J. Child. Rts. 155, 159 (2009). Another states that kafala "fulfils a function similar to adoption," even though its legal structure "appears closer to foster care." Hans van Loon, *The Accommodation of Religious Laws in Cross-Border Situations: The Contribution of the Hague Conference on Private International Law*, 2 Cuadernos Derecho Transnacional 261, 264 (2010). Yet another describes kafala as a "close relation" of an "open adoption," Shaheen Sardar Ali, *A Step Too Far? The Journey from "Biological" to "Societal" Filiation in the Child's Right to Name and Identity in Islamic and International Law*, 34 J.L. & Religion 383, 387

(2019); *see also* Julie Malingreau, *International Kafala: A Right for the Child to Enter and Stay in the EU Member States*, 16 Eur. J.L. Reform 401, 404–05 (2014) (stating that kafala "can be seen as a form of adoption because it is a protective measure that creates a link between a child and an adult" even though it does "not create legal parentage between the child and the adult").

Moreover, the ban on adoption identified in the Report, (*see* Doc. 40-2 at 10–12), is not consistent across Islamic countries. One author explains that some Islamic countries, like Morocco, have "situations that can be defined 'customary adoption,'" and "generally in this kind of adoption a family with no child or one with only boys or only girls may solicit a brother or a cousin who may be willing to give a child." Roberto Garetto, *The Impact of Multicultural Issues on the Notion of "Family Member"*, 79 Zbornik Znanstvenih Razprav 7, 13 n.26 (2019); *see also* Mia Dambach & Jeannette Wöllenstein-Tripathi, *Kafalah: Preliminary analysis of national and cross-border practices* 61 (2020), https://www.iss-ssi.org/wp-content/uploads/2023/03/ISS_Kafalah_ENG.pdf [https://perma.cc/NR9M-UXEL] (noting that, in cross-border guardianships, Pakistani courts may authorize a guardianship to be converted into adoption in other countries in which adoption laws exist). And in other Islamic countries, adoptions are not prohibited at all. *See* Nikos Koumoutzis, *The Islamic Prohibition of Adoption as Limitation of the Right to Respect for Family Life (Article 8 ECHR) – Revisiting* ECtHR Harroudj V France*, No 43631/09, 4 October 2012*, 13 Cuadernos Derecho Transnacional 939, 940 (2021) ("The prohibition of adoption is common to many Muslim jurisdictions; in fact, only Tunisia and Somalia stand out by regulating explicitly adoption."); Malingreau, *supra*, at 403 ("[N]owadays, we find a ban on strong adoption in most countries under Islamic law, except in Indonesia, Turkey, Tunisia, Somalia, and Lebanon.").

Furthermore, the term "kafala" has been used in some Middle Eastern countries to describe situations in which an employer sponsors a foreign worker by providing them room and board during their period of work; surety or guarantees; or providing hospitality to or "limited affiliation" between a tribe and foreigners, which supports that these

countries do not view kafala as an adoptive relationship.  Nicholas H.D. Foster, *The Islamic Law of Guarantees*, 16 Arab L.Q. 133, 138–39, 141 (2001); Garetto, *supra*, at 11; Malingreau, *supra*, at 413 (noting that many "cases have been observed in Morocco . . . in which Moroccan families choose their little housemaids directly in an orphanage, and for free, or by arranging with the family of the child in exchange for a paid job or money and property, under the guise of *kafala*"); Amrita Pande, "*The Paper That You Have in Your Hand Is My Freedom": Migrant Domestic Work and the Sponsorship (Kafala) System in Lebanon*, 47 Int'l Migration Rev. 414, 418 (2013) ("Historically, the term 'kafala' has been used to describe a mechanism for hosting foreigners in several countries in the Arabian Peninsula.  Through the kafala, citizens would vouch for a foreign visitor and assume responsibility for his/her behavior during the stay as well as his/her safety." (citation omitted)); Paula Renkiewicz, *Sweat Makes the Green Grass Grow: The Precarious Future of Qatar's Migrant Workers in the Run up to the 2022 FIFA World Cup under the Kafala System and Recommendations for Effective Reform*, 65 Am. U. L. Rev. 721, 733–34 (2016); Faraz Siddiqui & Aleea Stanton, *Blocking the Means to Exploit:* Ending Kafala *under the Principle of* Sadd al-Dhara'i, 61 How. L.J. 341, 347–48 (2018); Emilia Truluck, *Using Islam to Protect the Rights of Migrant Workers: Bringing* Kafala *into* Sharia *Compliance in Saudi Arabia*, 20 UCLA J. Islamic & Near E.L. 155, 161–62 (2023) (explaining roots of kafala practice).  And even in the context of family law, kafala can also refer to institutional foster care, as is the case in Pakistan.  Dambach & Wöllenstein-Tripathi, *supra*, at 17, 59.

Given the diversity amongst even Islamic countries about whether a kafala arrangement may qualify as an adoption, or even whether adoption is forbidden, it is unnecessary to decide whether a kafala arrangement could ever qualify as an adoption for purposes of the INA.  Put another way, it would be imprudent to foreclose the possibility that a different kafala arrangement than the one at issue in this case could qualify as an adoption, particularly if it severed the legal ties between a child and their biological parents.  Thus, the appropriate inquiry in this case is whether Qasim's kafala arrangement

1    constituted an adoption, as the parties agreed at oral argument.

2    **4.    Analysis of Qasim's Kafala Arrangement**

3    The following are the undisputed facts pertinent to that inquiry:   Qasim is not

4    Mehmoodi's biological child.  (Doc. 41 at 2; Doc. 43 at 1–2; Doc. 43-1 at 9, 29–30, 119,

5    140; *id.* at 178 (interrogatory responses); Doc. 45 at 12.)[7]   Qasim's parents entered into a

6    verbal kafala arrangement with Mehmoodi, in which Mehmoodi agreed to "claim [Qasim]

7    as her son[] to facilitate their entry into the United States."  (*See* Doc. 43 at 2; *see also* Doc.

8    41 at 2.)  Mehmoodi did not legally adopt Qasim.  (Doc. 41 at 2; Doc. 43 at 3; Doc. 44 at

9    4, 12.)  The arrangement between Mehmoodi and Qasim's parents did not sever Qasim's

10   legal ties with his parents.  (Doc. 44 at 3, 11.)[8]   According to Qasim, the kafala arrangement

11   was not documented or ordered by a court.  (Doc. 45 at 3, 10; Doc. 43 at 2.)   Qasim also

12   concedes that his kafala arrangement does "not equate to formal adoption" and that there

13   is in fact "no form of 'adoption' in Pakistan."  (Doc. 45 at 10, 12; *see also* Doc. 43 at 3–4;

14   Doc. 43-1 at 116, 120, 165.)

15   The Ninth Circuit's interpretation of § 1101(b)(1)(E) requiring the termination of

16   the legal relationship between a natural parent and an adopted child, *Young*, 114 F.3d at

17   885, is binding on this Court and is dispositive.  *See Hart v. Massanari*, 266 F.3d 1155,

18   1170–71 (9th Cir. 2001); *id.* at 1170 ("Binding authority . . . cannot be considered and cast

19   aside; it is not merely evidence of what the law is.  Rather, caselaw on point *is* the law.").

---

20   [7]    Qasim attached his separate statement of facts filed in support of his motion for
21   summary judgment to his response to the Government's motion for summary judgment as
     well.  (*See* Doc. 45 at 17.)  The Court thus construes Qasim's separate statement of facts
22   filed in support of his motion, (Doc. 43), as his statement of facts for resolution of both
     motions.

23   [8]    Qasim argued for the first time at oral argument that his mother relinquished her
24   parental rights when she handed him over to Mehmoodi.  This argument conflicts with
     Qasim's statement in his briefing that the kafala arrangement did not sever the legal ties
25   with his parents.   Arguments raised for the first time at oral argument will not be
     considered.  *See Rice Corp. v. Grain Bd. of Iraq*, 582 F. Supp. 2d 1309, 1313 (E.D. Cal.
26   2008).  Moreover, Qasim is bound by his counsel's admission.  *See Rodriguez-Gonzalez v.
     INS*, 640 F.2d 1139, 1141 (9th Cir. 1981) ("Even criminal defendants are bound by the
27   admissions of fact made by their counsel . . . in their presence and with their authority.").
     Qasim has not argued any "egregious circumstances" exist that would keep him from being
28   bound by his counsel's statements—Qasim's current counsel simply called the previous
     statements "inartful."  *See United States v. Guerra de Aguilera*, 600 F.2d 752, 753 (9th Cir.
     1979) (per curiam).

1  Because Qasim's kafala arrangement did not "terminate the legal relationship" between

2  Qasim and his biological parents, it does not qualify as an adoption under § 1101(b)(1)(E).

3  *See Young*, 114 F.3d at 885–86 (citation modified).[9]   The Ninth Circuit has also stated,

4  albeit without reasoning, that even an "informally adopted" child is "not considered a

5  'child' under the Immigration and Nationality Act." *Ramirez-Munoz v. Lynch*, 816 F.3d

6  1226, 1227 (9th Cir. 2016).  Thus, even construing Qasim's kafala arrangement as a form

7  of informal adoption, Qasim would still not qualify as Mehmoodi's child under

8  § 1101(b)(1)(E).

9       Moreover, that Qasim considered Mehmoodi his mother, or vice versa, (Doc. 43-1

10  at 27, 120, 165; Doc. 41-2 at 9), does not change the result because, as the Supreme Court

11  and the Ninth Circuit have held, relationships that merely "resemble" parent-child

12  relationships or are functionally parent-child relationships are not sufficient to make an

13  individual someone's child under the INA.  *See I.N.S v. Hector*, 479 U.S. 85, 90 (1986)

14  (per curiam) (stating that, even if an adult's "relationship with her nieces closely resembles

15  a parent-child relationship, . . . Congress, through the plain language of the statute,

16  precluded this functional approach to defining the term 'child'" (footnote omitted)); *id.* at

17  90–91 (stating that, although "Congress has shown its willingness to redefine the term

18  'child' on a number of occasions," it has not "authorized [courts] to adopt a functional

19  definition"); *Moreno-Morante v. Gonzales*, 490 F.3d 1172, 1178 (9th Cir. 2007)

20  ("Congress has precluded a functional approach to defining the term 'child.'  As a result,

21  [the immigrant's] de facto parent-child relationship with his grandchildren is of no

22  import . . . ." (citation and quotation marks omitted)).  Although *Hector* was analyzed under

23  a "now-repealed" statute, the Ninth Circuit noted that Congress "chose to leave the 'spouse,

24  parent, or child' language untouched, apparently finding no . . . error in the . . . courts'

25  application of these terms" and that the "'unusually detailed' and 'particularly exhaustive'

26  definition of 'child' applicable to the former statute [§ 1101(b)(1)] that so impressed the

27

28  _____

[9]     Qasim conceded at oral argument that *Young* would preclude his kafala arrangement from being an adoption if he was held to the admission in his briefing that the kafala arrangement did not sever his ties with his parents.

1  Supreme Court remains largely the same in the modified version" and, "[i]f anything, it is

2  now more detailed and comprehensive." *Moreno-Morante*, 490 F.3d at 1177–78 (citation

3  omitted).

4      The Ninth Circuit's decision in *Kaho* also does not compel a different result.  There,

5  the Ninth Circuit examined the Board of Immigration Appeals' ("BIA") precedent that a

6  Tonga customary adoption did not qualify under § 1101(b)(1)(E).  765 F.2d at 880, 883.

7  The court found the BIA's decision flawed in part because it relied on a later-retracted

8  conclusion of the Crown Solicitor that customary adoptions had no legal effect in Tongan

9  law, as the Crown Solicitor later stated that "customary adoptions have the effect of

10  creating a parent/child relationship recognized under Tongan law" and that "everyone

11  understands that customarily adopted children are treated in all respects as if they were

12  legally adopted except that they cannot inherit."  *Id.* at 884.  As for the prohibition on

13  inheritance, the Crown Solicitor stated illegitimate children were subject to the same ban,

14  but "they *also* are considered legally adopted."  *Id.* at 883 (quotation marks omitted).  That

15  there was a "lack of a statutory procedure for the adoption of legitimate children" did not

16  disqualify customary adoptions because of their consensual nature.  *Id.* at 884–85.  The

17  court thus held that a judicial act or the ability for an adopted child to maintain a

18  relationship with natural parents were not necessary for an adoption to be recognized as

19  valid for immigration purposes.  *Id.* at 885.  Importantly, however, in Tonga the adoptions

20  had the "effect . . . of creating a parent and child relationship," which is not the case for

21  Qasim's kafala arrangement here.  *Id.* at 883–84.

22      Qasim cites Article 20 of the United Nations Convention on the Rights of the Child,

23  which he argues "includes kafala as a protection measure for children temporarily or

24  permanently deprived of their family environment, affirming [kafala's] role in maintaining

25  the child's best interests" and as a result, kafala has "international recognition."  (Doc. 45

26  at 11.)  This argument is not persuasive.  Whether kafala is recognized internationally as a

27  legitimate practice has no bearing on whether Qasim's arrangement with Mehmoodi

28  qualifies as an adoption under § 1101(b)(1)(E) such that Qasim is properly considered

Mehmoodi's child. The same is true of the United Nations Guidelines for the Alternative Care of Children, which Qasim also cites. (Doc. 45 at 11.) These resolutions thus do not support a conclusion that Qasim's kafala arrangement qualifies as an adoption.

Qasim also cites the U.S. Customs and Immigration Services ("USCIS") Policy Manual, arguing it shows that a kafala order "may grant legal custody sufficient for purposes of emigration for adoption." (Doc. 45 at 12.) At best, the Policy Manual only confirms the analysis above that some kafala arrangements may constitute adoptions under the INA, depending on the circumstances. It does not mean that *Qasim's* kafala arrangement constitutes an adoption.

The Government cites the Policy Manual as well. (Doc. 40 at 19; Doc. 50 at 10.) The Government is correct that Qasim's kafala arrangement does not meet the Manual's definition of adoption under § 1101(b)(1)(E). *See* USCIS, 5 Policy Manual, pt. A, ch. 4 (last updated June 24, 2025), https://www.uscis.gov/policy-manual/volume-5-part-a-chapter-4 [https://perma.cc/G639-7QQ6] (requiring that adoption must "[t]erminate the legal parent-child relationship between the child and the prior legal parent(s)"). Although USCIS's definition of adoption does not warrant deference, *see generally Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024), it is persuasive and supports the conclusion that Qasim is not Mehmoodi's child under the INA. *See id.* at 394 (stating that "courts must exercise independent judgment in determining the meaning of statutory provisions" but may "seek aid from the interpretations of those responsible for implementing particular statutes").

At oral argument, Qasim argued that Ninth Circuit case law provides an affirmative defense to smuggling in the criminal context if the smuggled individuals are one's own children, but he conceded that such an affirmative defense had never been raised in the denaturalization context. He also conceded this argument was not made in his briefing. It will thus not be considered. *See Rice Corp. v. Grain Bd. of Iraq*, 582 F. Supp. 2d 1309, 1313 (E.D. Cal. 2008).

And although Qasim correctly argues that there is no precedent holding that kafala

1  does not qualify as an adoption for purposes of the INA, (Doc. 54 at 3–5), for the reasons

2  explained above, the conclusion that his kafala arrangement with Mehmoodi—due to its

3  specific features—does not qualify as an adoption logically follows from the Ninth

4  Circuit's binding authority.

5       Moreover, Qasim's argument that his "reliance on the kafala arrangement for his

6  lawful permanent residency and naturalization should be viewed as reasonable and made

7  in good faith" such that any decision should not be given retroactive effect, (*id.* at 5), lacks

8  merit.  The Ninth Circuit's decision in *Young* and the Supreme Court's decision in *Hector*,

9  for example, preceded Qasim's applications, and *Young* interpreted the same language that

10  is currently set forth in § 1101(b)(1)(E).  *Compare Young*, 114 F.3d at 885, *with* 8 U.S.C.

11  § 1101(b)(1)(E)(i).

12       Finally, although the parties vehemently dispute Qasim's knowledge, intent, and

13  whether the alleged false statements to immigration officials were made by Qasim himself,

14  this is immaterial to resolution of Count One because, even if Qasim did not engage in any

15  fraud or misrepresentation on his immigration application or to immigration officials, his

16  citizenship was still illegally procured if he was not the child of a refugee within the scope

17  of the INA.  *Fedorenko*, 449 U.S. at 514; *Kyong Ho Shin*, 607 F.3d at 1217; *see also Teng

18  Jiao Zhou*, 815 F.3d at 645 ("Whether at the time [the naturalized citizen] took the oath of

19  allegiance he knew that he violated any specific law or that he lacked moral character is

20  irrelevant to our 'illegally procured' analysis.").

21       Because "Congress has been actively engaged in delineating just how broad it

22  wishes the [INA's] definition of 'child' to be," courts are "especially bound to pay heed to

23  the plain mandate of the words Congress has chosen" and lack discretion to extend

24  immigration benefits to arrangements that are not adoptive in nature.  *See Hector*, 479 U.S.

25  at 90 n.6.  "Adopted" is the term Congress chose, not a "dependent," "foster arrangement,"

26  or mere legal custody.  Even if this result might "seem unduly harsh . . . it is the result

27  dictated by law."  *Moreno-Morante*, 490 F.3d at 1178; *see also Fiallo v. Bell*, 430 U.S.

28  787, 798 (1977) (stating that "it could be argued that the line [for qualifying adopted

children] should have been drawn at a different point," but "these are policy questions entrusted exclusively to the political branches of our Government, and [courts] have no judicial authority to substitute [their] political judgment for that of the Congress").  Qasim thus does not qualify as Mehmoodi's child through his kafala arrangement for purposes of the immigration laws.

Accordingly, Qasim was not the child of a refugee within the meaning of §§ 1101(b)(1)(E) and 1159(b)(4).  Because he does not argue he could have been admitted under any other basis, he was therefore not properly admitted to LPR status and, consequently, did not meet the requirements for naturalization.  *Fedorenko*, 449 U.S. at 514; *Teng Jiao Zhou*, 815 F.3d at 643.  The Government is thus entitled to summary judgment on Count One as a matter of law, and Qasim's cross-motion on Count One must be denied.  Qasim's naturalization was illegally procured and must be revoked.

### B.    Qasim's Motion on Counts Two through Five

Qasim also moves for summary judgment "on all [remaining] counts of the Complaint."  (Doc. 44 at 2.)  He argues that (1) the refugee application was submitted on his behalf when he was a minor, (2) he and Mehmoodi informed the case worker who prepared his LPR application that Mehmoodi was not his biological mother, and (3) he believed the kafala arrangement accurately described his relationship with Mehmoodi as that of a mother and son.  (*Id.* at 10–11, 14–15; Doc. 54 at 3.)  He concludes that the Government cannot prove he misrepresented his relationship with Mehmoodi or intended to deceive government officials in obtaining his immigration benefits.  (Doc. 44 at 11.)

The Government argues that the "singular purpose of the arrangement [between Qasim's mother and Mehmoodi] was for Mehmoodi to bring [Qasim] and his brother with her to the United States."  (Doc. 48 at 10.)  As a result, it argues Mehmoodi "made several misrepresentations to immigration officials when applying for refugee registration for herself, [Qasim], and Nasir . . . , all for the purpose of disguising their lack of a legitimate parent-child relationship," including by stating that Mehmoodi was married to Qasim's father, stating that Qasim's father died, and manipulating birth dates for Qasim and Nasir.

1    (*Id.* at 10–11.)   The Government argues that these lies continued in Qasim's LPR

2    application, in which Qasim listed Mehmoodi as his mother, listed his father as deceased,

3    and "den[ied] ever misrepresenting a material fact to procure entry into the United States

4    or any other immigration benefit."   (*Id.* at 11.)   The Government also cites the recorded

5    conversation between Mehmoodi, Qasim, and Ghani, in which Qasim discussed "what they

6    should tell federal agents," as well as Qasim's misrepresentations to federal agents when

7    he was being interviewed by the FBI and later admission that "he lied to U.S. immigration

8    officials about his relationship to Mehmoodi prior to immigrating to the United States."

9    (*Id.* at 12–14.)   Finally, the Government notes that Qasim pled guilty and admitted to telling

10   Mehmoodi to "lie to U.S. authorities about her relationship with [Nasir]" and stated at

11   sentencing that he "continue[d] with a lie [he] kn[e]w about was wrong."   (*Id.* at 15.)

12         Even if the Government had not prevailed on summary judgment on Count One,

13   granting Qasim summary judgment on the remaining counts would be inappropriate.   As

14   Qasim agrees, (Doc. 44 at 9–10), the remaining counts require the Government to prove

15   that Qasim committed fraud or willfully misrepresented a material fact in connection with

16   his LPR application (Count Two) and seeking naturalization (Counts Three, Four, and

17   Five).   (*See* Doc. 1 at 14–21.)   To be entitled to summary judgment, Qasim must "either

18   produce evidence negating an essential element" of the Government's claims or show that

19   the Government "does not have enough evidence of an essential element to carry its

20   ultimate burden of persuasion at trial."   *Nissan Fire*, 210 F.3d at 1102.   Qasim must also

21   "persuade the court that there is no genuine issue of material fact."   *Id.*   If a "reasonable

22   trier of fact could resolve the issue in the non-movant's favor," Qasim is not entitled to

23   summary judgment.   *Fresno Motors*, 771 F.3d at 1125.   And the evidence is viewed "in the

24   light most favorable to the [Government]" and "all reasonable inference[s] [drawn] in the

25   [Government's] favor."   *See Rookaird*, 908 F.3d at 459.

26         The evidence in the record shows several fact disputes that would preclude summary

27   judgment in Qasim's favor because, ultimately, "divergent ultimate inferences may

28   reasonably be drawn from the undisputed facts."   *Fresno Motors*, 771 F.3d at 1125

(quotation marks omitted).  Qasim argues he did not falsify or intend to misrepresent the nature of his relationship with Mehmoodi, but a reasonable factfinder could draw the opposite inference—that Qasim knew the information provided in the immigration paperwork was false and/or intended to mislead officials into believing Qasim was Mehmoodi's biological child, repeated the false information in later immigration proceedings, and attempted to cover up the truth over many years.

Putting aside whether Qasim could be responsible for misrepresentations made on his behalf while he was a minor, and assuming Qasim did not make any misrepresentations of his own in the process, Qasim repeated much of the same information in his LPR application completed on his own, as an adult.  (Doc. 43-1 at 69.)  Although it is unclear whether Mehmoodi or Qasim told the caseworker who prepared his LPR application that Mehmoodi was not his biological mother, (*see id.* at 79–80, 146, 167), he repeated the information from his refugee application that his father was deceased, (Doc. 41-4 at 7, 12 (refugee application); Doc. 41-5 at 15 (LPR application)), and that he was born in the same town as Mehmoodi, (Doc. 41-4 at 6 (refugee application); Doc. 41-5 at 15, 17 (LPR application)).  A reasonable inference from Mehmoodi's and Qasim's testimony is that these facts were falsely stated to more easily obtain refugee classification and claim Qasim was Mehmoodi's child.  (Doc. 41-2 at 8–9, 20; Doc. 41-3 at 22–23.)

Additionally, in his LPR application, Qasim declared under penalty of perjury that the information he provided was true and correct, and that he had not, "by fraud or willful misrepresentation of a material fact, ever sought to procure, or procured, a visa . . . or any other immigration benefit."  (Doc. 41-5 at 18–19.)  A reasonable factfinder could find that these misstatements constituted perjury and were made to mislead government officials or conceal previous misrepresentations made in the refugee application, all with the intent of procuring LPR status.  *See Fedorenko*, 449 U.S. at 509 ("[A] misrepresentation must be considered material if disclosure of the true facts would have made the applicant ineligible for a visa."); *Kungys v. United States*, 485 U.S. 759, 772 (1988) ("[W]hether [an applicant's] concealments or misrepresentations [are] material is whether they had a natural

tendency to influence the decisions of the Immigration and Naturalization Service.").

In his naturalization application, Qasim stated under penalty of perjury that he had not "**ever** committed a crime or offense for which [he was] not arrested" or "given false or misleading information to any U.S. Government official while applying for any immigration benefit," (Doc. 41-5 at 12, 14), and reaffirmed his statements under penalty of perjury at an interview with a government official, (*id.* at 14; Doc. 41-7 at 2–3). At his interview, Qasim affirmatively stated under oath that he had not committed a crime or arrest for which he had not been arrested, which would have included perjury. (Doc. 41-7 at 4.) The government official who interviewed Qasim stated that the official would not have approved Qasim's naturalization application if Qasim had disclosed he was not Mehmoodi's child or that he had misrepresented his relationship in previous immigration application or would have, at a minimum, "conducted further inquiry into [his] eligibility to naturalize." (*Id.* at 5.)

A reasonable factfinder could thus find that Qasim's answers in his naturalization application and interview were false and either allowed Qasim to obtain naturalization to which he was not entitled or prevented the Government from discovering disqualifying facts. *See* 8 U.S.C. § 1427(a)(3) (an applicant shall not be naturalized if he has not been a "person of good moral character"); *id.* § 1101(f)(6) (providing that a person "shall [not] be regarded as . . . a person of good moral character" if he "has given false testimony for the purpose of obtaining any [immigration] benefits under this chapter"); *Kungys*, 485 U.S. at 779–80 ("Literally read, [§ 1101(f)(6)] denominates a person to be of bad moral character on account of having given false testimony if he has told even the most immaterial of lies with the subjective intent of obtaining immigration or naturalization benefits."); *see also Maslenjak*, 582 U.S. at 349 (stating that, in the context of § 1451(a), "a person whose lies throw investigators off a trail leading to disqualifying facts gets her citizenship by means of those lies—no less than if she had denied the damning facts at the very end of the

trail.").[10]

A reasonable factfinder could also discredit Qasim's account that he meant to convey in his immigration paperwork that he was Mehmoodi's *de facto* or adopted child through the kafala arrangement. (Doc. 43 at 3–4; Doc. 44 at 2.) *See S.E.C. v. Koracorp Indus., Inc.*, 575 F.2d 692, 699 (9th Cir. 1978) ("The courts have long recognized that summary judgment is singularly inappropriate where credibility is at issue. Only after an evidentiary hearing or a full trial can these credibility issues be appropriately resolved."). First, Nasir and Mehmoodi testified that Qasim and Nasir called Mehmoodi "Aunt" while living in the United States but called her "Mother" when "in some office or with the doctors or anybody," suggesting that Mehmoodi, Qasim, and Nasir intended to portray a biological relationship rather than an adopted relationship. (Doc. 41-2 at 12; Doc. 43-1 at 167–68.) Second, when Qasim learned that Mehmoodi was going to be speaking with the FBI, he, Mehmoodi, and Ghani strategized on what to tell the agents about Qasim's and Nasir's relationship with Mehmoodi and even rejected the idea to "say that she is [their] adopted mother," which undercuts that Qasim intended to portray Mehmoodi as his adopted mother in his immigration paperwork. (Doc. 41-8 at 35–36, 38–41, 45, 51–52; *id.* at 49 ("Nasir asked what we should say about this. I said if you say that she is not your mother, *then you are done*. . . . They would question that you lied in the first place to get here. It means you came here by lying. It would not be out of question that they take away your citizenship.").) Third, in his initial interview with FBI agents, Qasim initially claimed Mehmoodi was his mother, his father died in an explosion, and his biological mother was his aunt. (Doc. 41-8 at 8, 10.)

Likewise, a reasonable factfinder could find that, if Qasim had intended to convey that Mehmoodi was his adopted mother in his immigration paperwork, he would have said so in his initial interview with FBI agents and would not have falsely stated his biological

---

[10]    Although the "ultimate finding of materiality turns on an interpretation of substantive law" and is therefore a question of law, materiality nevertheless "rests upon a factual evidentiary showing" that is not properly resolved at the summary judgment stage, given the disputes concerning Qasim's intent. *See Kungys*, 485 U.S. at 772 (citation omitted).

1    mother was his aunt, particularly considering he later admitted to FBI agents that he lied

2    in his immigration paperwork in stating that Mehmoodi was his biological mother and that

3    he "disguise[d] his relationship with his cousins . . . to avoid detection of the false

4    information he provided to the U.S. government claiming that [Mehmoodi] was his

5    mother."  (Doc. 41-8 at 11–12, 24.)

6        Qasim also admitted in his plea agreement that he "attempt[ed] to convince

7    [Mehmoodi] to continue telling U.S. authorities that Nasir . . . was her true son" and that

8    his "purpose in speaking with [Mehmoodi] . . . was to keep Nasir['s] immigration status

9    from being questioned by the United States."  (Doc. 41-8 at 6.)  Qasim stated in his

10   sentencing that he "came to the United State[s] with the backdrop of that lie enabling us to

11   come here, and [he chose] to continue with that lie," (Doc. 42-4 at 9), which Qasim could

12   be estopped from denying.  (Doc. 42-1 at 4–5 (agreeing to waive "any collateral attack"

13   against his conviction or "any aspect of [his] sentence"); *id.* at 6 (agreeing that he would

14   "swear under oath to the accuracy" of the factual elements of his plea agreement).)  *See*

15   *Rissetto v. Plumbers & Steamfitters Loc. 343*, 94 F.3d 597, 600 (9th Cir. 1996) ("Judicial

16   estoppel . . . precludes a party from gaining an advantage by taking one position, and then

17   seeking a second advantage by taking an incompatible position.").  A reasonable factfinder

18   could infer from these statements that Qasim knowingly lied in his immigration paperwork

19   about his relationship with Mehmoodi.[11]

20       Thus, because a reasonable factfinder could find that Qasim lied in his immigration

21   paperwork to obtain LPR status and citizenship, Qasim is not entitled to judgment as a

22   matter of law on Counts Two through Five of the Complaint.

23   **V.    CONCLUSION**

24       Although the Government's burden when seeking a judgment of denaturalization is

25   high, the undisputed facts compel the conclusion that Qasim's LPR status is void because

26   he is not a child of a refugee.  Consequently, Qasim's naturalization was illegally procured

---

27   [11]    At oral argument, Qasim argued that his guilty plea could not be used against him
28   because there is a different standard in change of plea colloquies and denaturalization
     proceedings.  This argument was not made in his briefing, so it will not be considered.  *See*
     *Rice Corp.*, 582 F. Supp. 2d at 1313.

1    within the meaning of § 1451(a) because Qasim did not satisfy all statutory requirements

2    for citizenship, and his citizenship must be revoked.

3          Accordingly,

4          **IT IS ORDERED** that the Government's motion for summary judgment (Doc. 40)

5    is **granted**.

6          **IT IS FURTHER ORDERED** that Qasim's motion for summary judgment (Doc.

7    44) is **denied**.

8          **IT IS FURTHER ORDERED** that Sabir Qasim's United States citizenship will be

9    revoked pursuant to the authority of 8 U.S.C. § 1451(a).

10         **IT IS FURTHER ORDERED** that a hearing will be held on **October 23, 2025, at**

11   **1:30 p.m.** for the purpose of determining what measures should be taken by the Court in

12   light of this decision.  The Government shall file a short memorandum (not to exceed 5

13   pages) on or before **Friday, October 10, 2025,** setting forth the measures it believes the

14   Court should take.  Qasim shall file a response (not to exceed 5 pages) on or before

15   **Monday, October 20, 2025**.

16         **IT IS FURTHER ORDERED** that this Order does not constitute a final judgment

17   for purposes of appeal.  The Court will enter a final judgment after the October hearing, at

18   which point the time for appeal will begin to run.

19         Dated this 30th day of September, 2025.

Honorable Sharad H. Desai
United States District Judge

- 30 -